

# NUMBER 13-19-00587-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CARLOS BANDA A/K/A
CARLOS BANDA JR.,                                              Appellant,

v.

THE STATE OF TEXAS,                                           Appellee.

### On appeal from the 197th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Carlos Banda a/k/a Carlos Banda Jr. appeals his convictions of continuous sexual abuse of a child, a first-degree felony, indecency with a child by sexual contact, a second-degree felony, and aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11(a)(1), 22.021(a)(1)(B)(ii).

By nine issues, which have been renumbered and reorganized, Banda argues: (1) an investigator with the Department of Family and Protective Services (Department) was improperly designated as the outcry witness because she was not the "first person" to whom T.B.,[1] one of the complainants, made an outcry, and an investigator is not a "trusted" person under the outcry statute; (2) T.B., seventeen years old at trial, is not a child, and she cannot utilize the hearsay exception afforded by article 38.072 of the Texas Code of Criminal Procedure; (3) the trial court abused its discretion in admitting the lay witness testimony of T.B.'s therapist, who was not designated as an expert witness prior to trial and (4) improperly restrained Banda's ability to cross-examine T.B.'s therapist; (5) the trial court abused its discretion by permitting testimony from the detective which "arose out of lack of personal knowledge, improper opinions, and hearsay"; (6) the trial court erred by making inappropriate comments in the presence of the jury in violation of article 38.05 of the Texas Code of Criminal Procedure; (7) the trial court abused its discretion in "allowing attacks against [Banda] outside of notice given in [Rule] 404" when a State's witness testified that Banda watched pornography; (8) the trial court abused its discretion in denying Banda's request for a mistrial; and (9) the previous alleged errors cumulatively caused him harm. We affirm the judgment as modified.

## I.    BACKGROUND

Banda was arrested on charges of continuous sexual abuse of a child, aggravated sexual assault of a child, and indecency with a child by sexual contact. *See id.* The

---

[1] We use initials for the minor complainants involved and their family members in order to protect their identities. *See* TEX. R. APP. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

complainants in the case are T.B. and A.C., Banda's former stepdaughters. Banda was indicted on all three charges and pleaded not guilty.

## A. Outcry Designation Hearing

Prior to trial, the trial court held an outcry designation hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (permitting hearsay statements of certain abuse victims). J.M., T.B. and A.C.'s mother, testified that she and Banda were married from 2007 to 2012 and had one child together, C.Y.B. J.M. testified that she has five children in all: 17-year-old T.B., 16-year-old K.C., 14-year-old A.C., 12-year-old C.Y.B., and 3-year-old L.M. Prior to 2015, J.M. and her children resided in Brownsville.[2] J.M. and her children now reside in Fort Worth with her husband, D.M.

J.M. testified that she first became aware of the allegations involving Banda after she confiscated A.C.'s tablet in April 2017. J.M. saw text messages on A.C.'s tablet, wherein A.C. claimed, among other things, she had been sexually abused. In early May 2017, J.M. confronted A.C., who told her that Banda "made her put his—his penis in her mouth," and A.C. described an incident that occurred around Halloween when she was in the first grade. A.C. revealed "it had happened" to her sister, T.B., too. J.M. said T.B. initially denied any allegations, but T.B. eventually said that Banda "had touched her and put his hands in her private part." J.M. testified she understood T.B. to mean that Banda had touched T.B.'s "breast." When asked if T.B. identified "any other parts," J.M. stated, "No."

Dolores Urzua, an investigator with the Department, testified she was assigned to the case on May 31, 2017, after law enforcement became involved. At the time, T.B. was

---

[2] K.C., however, resided with her biological father.

fifteen years old and A.C. was eleven years old. Urzua testified that T.B. "made an outcry of sexual abuse," alleging her ex-stepfather, Banda, touched her breasts and genitals "over clothes and under clothes," forced her to perform oral sex on him, and "showed her pornography."

Banda argued Urzua could not be designated as the outcry witness for T.B. because Urzua was not the individual T.B. made the "the first outcry" to, and as a Department investigator, she was not a "trusted" person under the outcry statute. The State countered that Urzua was an appropriate outcry witness regarding allegations that Banda had touched T.B.'s female sexual organ, which T.B. only related to Urzua and was a different sex act than that which was related to J.M. The trial court designated Urzua and J.M. as outcry witnesses.

## B. State's Case-in-chief

### 1. A.C.

At the time of trial, A.C. was fourteen years old and in the eighth grade. A.C. testified she could not remember when she first met Banda, because until Banda and her mother divorced, she thought he was her biological father.

A.C. said she was "six or seven" years old when Banda sexually assaulted her. A.C. testified that it happened around Halloween, and she remembered they had been eating cookies that were shaped like pumpkins. J.M. was either at work or at school. "I was in the room with my brother. We were watching Sponge Bob. [Banda] had called me. He said, 'Come here.'" The testimony that followed was brief:

> [STATE:] So [Banda] calls you out to the living room. What do you remember when you get to the living room?
>
> [A.C.:] It wasn't the living room.

4

| | |
|---|---|
| [STATE:] | Oh, where? I'm sorry. Thank you for correcting me. Where did he call you out to? |
| [A.C.:] | The dining room table. |
| [STATE:] | And what did you see when you got to the dining table? |
| [A.C.:] | Two water bottles and [T.B.]. |

. . . .

| | |
|---|---|
| [STATE:] | Or what is the next thing you remember? |
| [A.C.:] | I was on my knees. |
| [STATE:] | And how was [Banda]? |
| [A.C.:] | He was sitting down. |
| [STATE:] | And what was happening? |
| [A.C.:] | I was sucking his penis. |

A.C. said she did this while her sister watched. According to A.C., she and T.B. never spoke of it until 2017, after their mother found out.

A.C. testified that in April 2017, J.M. had taken away her tablet because she was "acting up." The tablet contained text messages between A.C. and her friends, wherein A.C. had opened up about sexual abuse involving Banda and expressed wanting to "overdose." J.M. did not speak to A.C. about the tablet's contents until May. When J.M. confronted A.C. during a walk, A.C. said she "started laughing, because [she] felt nervous and weird." A.C. said she eventually told J.M. what had happened and said she thought it had happened to T.B. too, which prompted J.M. to ask T.B.

On cross-examination, A.C. was questioned as to how she could have "completely forgotten" a single incident that occurred to her at the age of six, only to have it "pop[] up

again later." A.C. maintained that the memory had only resurfaced after she was speaking to a friend who had first disclosed his own history of abuse.

### 2. T.B.

T.B. was seventeen years old and a senior in high school during trial. "I was in kindergarten when I first met [Banda]." T.B. testified that she, Banda, J.M., and A.C. resided in a fourplex in Cameron Park from the first grade to the third grade. "I remember grades. I don't remember my age," she explained.

T.B. testified she was in the first grade the first time Banda sexually assaulted her. "It was nighttime. He was putting us to bed, and my mom wasn't home. . . . He gave us kisses at night. And he gave a kiss to my sister, and then he gave me a kiss, but it wasn't just a goodnight kiss. . . . It was just long." T.B. said she went to sleep and was later awoken by Banda "shaking" her. T.B. was in the living room and could not recall how she ended up there. "[Banda] [p]ull[ed] off his pants, not all the way, but just enough. He pulled out his penis[,] and he told me to suck it." T.B. said she complied out of fear. T.B. testified that Banda said she would "end up in a foster care or in an orphanage" if she told anyone what he had done. T.B. said it was at the fourplex that Banda also "made [her] watch porn" in the family living room; T.B. said Banda played "CDs" depicting men and women having sex. T.B. testified that nothing would happen while he watched pornography alongside her. T.B. said incidents of sexual abuse continued until she was in the seventh grade[3]—despite Banda's assurances that each time would be the last.

When she was in the fourth grade, T.B.'s family moved to Brandy Wyne Apartments, and it was there that he orally penetrated her vagina. T.B. detailed one

---

[3] After Banda and her mother divorced, T.B. said Banda would continue to watch them whenever J.M. had to work.

6

instance where Banda was "laying down on the bed," with his back against the bed, and she was "facing his penis" while he faced her vagina. T.B. described how Banda's tongue felt on her body. T.B. said Banda stopped after C.Y.B., who would have been four or five years old at the time, walked in on them.

It was at the Brandy Wyne Apartments that T.B. also witnessed Banda assault her sister. T.B. said, "It was just like every other time": Banda requested oral sex, T.B. declined, Banda insisted it would just be "one more time," and T.B. yielded. This time, however, Banda "got up and he said he'd be right back," and he returned with A.C., instructing A.C. to "suck[] his penis."

T.B. expounded on multiple incidents of oral penetration that occurred in the "house next to his brother's house," in Banda's car, and at "this house he was working at." T.B. said, however, there was only one instance of vaginal to penile penetration, and it happened at "the shack." T.B. testified that the shack consisted of an open big room: "There's a bed as soon as you walk in, TV stand, there was a TV, and in the back, there's a restroom." Although T.B. said Banda had touched her "countless times" at the shack, she testified to one occurrence in detail. T.B. said that after she had "sucked his penis," he laid her on the bed. "He glided his penis over my vagina that time. . . . One [hand] was grabbing my boob, and the other one was just carrying his weight." T.B. said Banda ejaculated "over [her] stomach."

T.B. also described incidents where Banda would briefly touch her genitals or breasts over her clothes. T.B. said, for example, when Banda would go over to pick up C.Y.B. for visitation after the divorce, T.B. would open the door to greet him; "As I was

7

calling [C.Y.B.], [Banda] touched me. And when [C.Y.B.] came, [Banda] would just walk away."

According to T.B., in April 2017, J.M. told her about the text messages she had discovered going through A.C.'s tablet. T.B. said she did not tell J.M. "anything at that moment"; she instead excused herself, "walked outside[,] and cried." "I felt powerless. I mean, I felt like I wasn't a good enough sister, that I didn't, you know, keep her from this. I felt like a failure." T.B. said it took J.M. a couple of weeks to confront A.C. about the text messages, and when J.M. did, it was during a walk in the neighborhood. T.B. said she was walking ahead of J.M. and A.C. when the conversation occurred out of earshot. "A couple of minutes later," J.M. approached T.B., asking her, "'What did [Banda] make you do? What happened?'" T.B. testified that she then told her mother how Banda "made [her] do some things," how "every time [she] would tell him to stop," and how he would tell her, "'One more time.'"

T.B. testified that the whole experience of opening up about the sexual abuse left her feeling overwhelmed. "It was something that I just didn't want to tell people about. . . . And I didn't want my family to look at me any different." T.B. said going to therapy has helped her reconcile with her feelings. T.B. testified that she initially felt "anger"—at Banda, at herself for not saying anything sooner, and at her mother for thinking "it was safer to be in the house" with Banda than anywhere else.

On cross-examination, T.B. was questioned regarding various avenues of exposure to sex[4] and confronted with information gathered from her Facebook page,

---

[4] Defense counsel asked T.B. whether she had been "exposed to sex in many forms" because of her mother.

wherein she indicated she "liked" the book *50 Shades of Gray* and posted the comment, "cause it's always going to be me and my mom against the world," on March 27, 2016.

### 3. J.M.

J.M. said she met Banda in July 2006, when she was working at a gas station. The two were married in August 2007. In 2008, they moved to Cameron Park, a fourplex apartment in Brownsville. J.M. said she worked several jobs while they were married, and she eventually went back to school to become a medical biller. J.M. described Banda as a good father and said that even after the two separated in July 2012, he was always willing to help watch the children while she was working or at school. J.M. moved to Fort Worth in 2016 and remarried in 2019.

In April 2017, J.M. saw messages on A.C.'s tablet, wherein A.C. claimed she "wanted to hurt herself." J.M. then "came across a paragraph" indicating A.C. had been sexually abused by Banda. J.M. said she waited several weeks to speak to her daughter about what she had seen regarding the sexual abuse because she wanted to address A.C.'s suicidal ideations first. J.M. said A.C. initially "kind of, smirked" and "laughed" when she was confronted about the abuse allegations. Eventually, A.C. disclosed that Banda had made her perform oral sex on him, and T.B. had been present. J.M. testified that she

---

| [DEFENSE COUNSEL:] | Okay. Because your mom would have many lovers, correct? |
| --- | --- |
| [T.B.:] | Just my siblings' dads. |
| [DEFENSE COUNSEL:] | Okay. And, then—well, you remember Jerry De La Fuente? |
| [T.B.:] | No. |
| [DEFENSE COUNSEL:] | No? Do you remember times when she would have two lovers at the same time? |
| [T.B.:] | No. |

then approached T.B. with the allegations, and T.B. appeared "scared" and "denied it." When J.M. persisted and repeated A.C.'s allegations, T.B. "broke down" and apologized. T.B. said she "was sorry that she couldn't protect [A.C.]." J.M. called the Brownsville Police Department that evening to file a report.

In the months that followed, J.M. arranged for individual and group therapy for T.B., A.C., and herself. During therapy, J.M. learned that T.B. blamed her for everything that had transpired. J.M. said it hurt to hear T.B. state that she felt "it would not have happened" if J.M. had not left her with Banda so often. J.M. said to this day she does not know the full extent of what happened to T.B.

On cross-examination, J.M. admitted she has been previously convicted of felony theft of more than $20,000, but less than $100,000, and separately, a food stamp offense.[5] J.M. denied any possible ulterior motives in pursing the charges against Banda.

### 4. Dolores Urzua

Defense counsel reurged his objections to Urzua testifying as an outcry witness and was overruled. Urzua's testimony with respect to what was specifically told to her by T.B. was brief:

> She—she identified her private parts, what she calls them. She made an outcry regarding [Banda], saying that he touched her over and under her clothes on her vagina and her boobs. And the child also stated [Banda] made her put his dick in her mouth, and that [Banda] also showed her porn. I asked what porn was, she said it was a man and woman having sex.

After speaking with T.B. and A.C., Urzua referred the children for a forensic interview and sexual abuse examination.

---

[5] *See* TEX. R. EVID. 609(a)(1) (permitting evidence of a "criminal conviction offered to attack a witness's character for truthfulness must be admitted if . . . the crime was a felony or involved moral turpitude"); *Ex parte De Los Reyes*, 392 S.W.3d 675, 676 (Tex. Crim. App. 2013) (identifying theft as a crime of moral turpitude).

### 5. Theresa Fugate

Theresa Fugate, a nurse at Cook Children's Medical Center in Fort Worth, obtained a medical history and conducted a physical examination of both girls. Fugate said T.B. described instances of penile to vaginal contact via "rubbing in-between," oral copulation, masturbation contact, and fondling of breasts and genitalia.

Following a collection of T.B.'s medical history, Fugate performed the examination. Fugate said that while T.B. "did allow [her] to visualize everything genital-wise," T.B. "didn't tolerate" a speculum exam. Fugate testified that T.B. did not display any injuries, and "based on what [T.B.] told [her], [she] wouldn't expect to find any injury." Fugate explained, "Often, very often, there's not any injury or any way [of] telling by looking if anyone's had sex."

Fugate said A.C.'s medical history was short, and "all [A.C.] described was just the oral to [Banda]." As with T.B., Fugate testified that "everything looked normal on [A.C.], also."

### 6. Michelle Larson

Michelle Larson, a clinical therapist in Fort Worth, testified that she is trained and nationally certified in Trauma-Focused Cognitive Behavioral Therapy. Larson stated that trauma symptoms are "vast" and "can be anything from anger or sadness and depression, isolation, acting out sexually, [to] self-harming behaviors." Larson testified that it is common for a child to believe fault lies with them after having been abused. Larson worked with T.B. from August 2017 through August 2018, when T.B. graduated from group and individual counseling.

On cross-examination, Larson was asked about therapy notes pertaining to physical abuse J.M. had inflicted on T.B. Larson said that the notes that Banda referred to were likely taken by intake personnel, that the signature at the bottom of the page was not hers, and that she could not recollect whether T.B. and her had discussed any abuse by J.M. However, Larson did recall T.B. stating that she had witnessed domestic violence between her mom and "her sister's dad." Larson was also questioned regarding studies of repressed memory and associated retrieval errors. Larson testified that though she was "aware" that such research exists, she had limited familiarity. The trial court sustained the State's objection to Banda's attempt to question Larson on her knowledge of specific studies.

### 7.    Humberto Delgado

Detective Humberto Delgado, a Brownsville Police Department Crime Scene Investigator, testified he was assigned to this case after J.M. filed a police report. Detective Delgado said that although J.M. had provided A.C.'s tablet to law enforcement and an agent had conducted an extraction of the device's contents, the messages alleging sexual abuse were never retrieved. Detective Delgado arranged for the minor that A.C. had been in communication with to be interviewed at the child advocacy center, where the minor corroborated A.C.'s statements. Detective Delgado obtained an arrest warrant for Banda.

### 8.    Other Witnesses

Monica Galvan-Castillo, a forensic interviewer with Cameron County Children's Advocacy Center, testified generally about the interview process. Galvan-Castillo did not interview either child in this case.

Olga Lydia Marez, T.B.'s aunt and sister of T.B.'s biological father, described T.B. as a "nice, quiet child." Marez said that though she had not spoken with J.M. or A.C. regarding the allegations, T.B. approached her privately to talk about it. Unprovoked, Marez called Banda a "pervert." The trial court ordered the jury to disregard Marez's statement and denied Banda's request for a mistrial on that basis.

## C. Banda's Case-in-chief

### 1. Banda's Relatives

Leticia Banda, Banda's mother, testified she had never seen him behave inappropriately with young children. "He's been around a lot of children, and never— never, ever." Unlike J.M., who "does lie," Leticia said her son has a reputation for being a truthful, law-abiding person.

Banda's aunts, Guadalupe Sosa, Leticia Rios, and Yolanda De La Garza, each testified that they have witnessed him behave appropriately around children, and Sosa described Banda's "reputation for being appropriate with children" as "excellent." Banda's fifteen-year-old cousin testified that he has always been appropriate with her. Banda's twelve-year-old niece, testified that Banda was a good uncle and father.

Maria Eugia testified that Banda is the father to her four-year-old daughter. Eugia described Banda as a "good father," and said that although she was aware of the allegations against him, she trusted him to be alone with her nonverbal child.

### 2. Virginia Voltaggio Wood

Virginia Voltaggio Wood, a retired psychology professor from the University of Brownsville, testified to memory "encoding, storage and retrieval." Wood testified that she did not speak with anyone involved in the case and had not been shown any evidence

prior to trial. On cross-examination, Wood acknowledged the difference between studies on memory—wherein testers purposefully sought to put false thoughts into a child's mind, prompting the child to fabricate a traumatic event—and what a forensic interviewer is formally trained to do. Wood further agreed that a child can recall sexual abuse "later on," and a child who has been sexually assaulted can have "long-term" effects, which include nightmares, flashbacks, and suicidal ideations.

### 3. Banda

Banda, thirty-nine years old at trial, testified that he currently works for his father painting houses. Banda testified that he met J.M. when she was working at a convenience store. They were married shortly after their son C.Y.B. was born. Banda said their relationship became strained a few years after they divorced—"ever since before, but [in] 2017[6] [it] was especially more difficult." Banda said he was "opposed" to J.M. moving to Fort Worth. "I even tried contacting her probation officer, but, apparently, she got permission to go over there." Banda said J.M. interfered with his visitation rights, and only allowed Banda and their son to speak "depending on her mood." Banda said he called the police in March 2017 in an attempt to exercise his visitation rights after J.M. went "three to four weeks" without returning his phone calls. Banda testified that he thereafter hired an attorney, who issued a letter to J.M. dated June 7, 2017, on his behalf. Banda maintained he contacted J.M. prior to its issuance to warn her that he was "going to service her through the attorney to take her to civil court to fight for custody" of C.Y.B.

Banda denied the accusations against him involving T.B. and A.C. and said even after the divorce, he thought of them as his daughters. Banda testified that their

---

[6] Evidence at trial indicates J.M. had been residing in Fort Worth with the children since February 2016.

14

allegations of sexual assault were unsupported because their home was always full and there would have been no opportunity for an assault to occur. "There were a lot of kids and [J.M.'s] mother that would always be there." Banda said that there were several occasions, for significant periods of time, that J.M.'s parents or J.M.'s sisters and their multiple children lived with them. Banda further claimed that T.B.'s accusations involving "the shack" "would have been impossible because the house was in a framing state" without any exterior walls during the time of the alleged offense.

### D. Verdict and Sentence

The jury returned a guilty verdict on all three charges. Following a hearing on punishment, the jury assessed punishment at twenty-five years' imprisonment for count one of continuous sexual abuse of a child under fourteen years of age, five years' imprisonment for count two of aggravated sexual assault of a child, and two years' imprisonment for count three of indecency with a child—each count to run concurrently. *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11(a)(1), 22.021(a)(1)(B)(ii). This appeal followed.

## II. OUTCRY WITNESS DESIGNATION

Banda's first argument is multifaceted. He argues: (1) the trial court improperly designated Urzua as an outcry witness because she was not the "first person" to whom T.B. made an outcry, and Urzua is not a "trusted person" under the statute; and (2) T.B., seventeen years old at trial, is precluded from utilizing the hearsay exception afforded by the statute. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072.

15

**A. Standard of Review and Applicable Law**

Hearsay is a written or oral statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted; and as such, hearsay is inadmissible evidence unless expressly excepted or excluded from this general rule by statute or the rules of evidence. *See* TEX. R. EVID. 801(a), (d), 802; *Coble v. State*, 330 S.W.3d 253, 290 n.101 (Tex. Crim. App. 2010). "Article 38.072 is a rule of admissibility of hearsay evidence," allowing for the admission of a child victim's out-of-court statements describing the alleged sexual or physical abuse under specified, enumerated circumstances. *Martinez v. State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005) (discussing the limitations of article 38.072); *see* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a); *Lopez v. State,* 343 S.W.3d 137, 140, 144 (Tex. Crim. App. 2011) (describing the outcry statute as permitting "hearsay testimony" from an "outcry witness").

Article 38.072 only applies to statements that (1) describe the alleged offense, (2) were made by the child against whom the charged offense was allegedly committed, and (3) "were made to the first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense or extraneous crime, wrong, or act." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a); *see Sanchez v. State*, 354 S.W.3d 476, 484–85 (Tex. Crim. App. 2011). In other words, a proper outcry witness is the first adult to whom the child tells the details of how, when, and where the sexual abuse occurred. *Rosales v. State*, 548 S.W.3d 796, 806 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). As the proponent of the evidence, the State has the burden to establish the elements of article 38.072. *Id.*

The outcry statute further requires that the trial court hold a hearing outside the presence of the jury to determine whether the proffered "statement is reliable based on the time, content, and circumstances of the statement." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2). It does not, however, "charge the trial court with determining the reliability of the statement based on the credibility of the outcry witness." *Sanchez*, 354 S.W.3d at 487–88. Moreover, the trial court may designate more than one outcry witness provided that each witness testifies about a distinct, separate event. *Lopez*, 343 S.W.3d at 140; *Gibson v. State*, 595 S.W.3d 321, 326 (Tex. App.—Austin 2020, no pet.).

An appellate court reviews a trial court's outcry witness designation for an abuse of discretion. *See Garcia v. State*, 792 S.W.2d 88, 91–92 (Tex. Crim. App. 1990); *Castelan v. State*, 54 S.W.3d 469, 475 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc)). Trial courts have broad discretion when deciding which witnesses qualify as outcry witnesses. *Garcia*, 792 S.W.2d at 92; *see also Morin v. State*, No. 13-18-00149-CR, 2020 WL 582157, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 6, 2020, no pet.) (mem. op., not designated for publication).

## B. Multiple Outcry Witnesses

At the outset, Banda asserts that the statute prohibits the use of multiple outcry witnesses even where witnesses testify to separate events.

This issue, however, is well-settled in our jurisprudence. Hearsay testimony from more than one outcry witness may be admissible under article 38.072 so long as each of

17

the witnesses testifies to a different instance of sexual abuse. *Lopez*, 343 S.W.3d at 140 ("Hearsay testimony from more than one outcry witness may be admissible under article 38.072 only if the witnesses testify about different events."); *Rosales*, 548 S.W.3d at 808 ("The outcry witness designation is event-specific, not person-specific."); *see also Quinones v. State*, No. 13-10-00140-CR, 2011 WL 3841586, at *9 (Tex. App.—Corpus Christi–Edinburg Aug. 25, 2011, no pet.) (mem. op., not designated for publication) ("[S]o long as separate outcry witnesses testify about separate offenses, the testimony of each is admissible.").

The outcry testimony of a second witness is not admissible, however, when the witness merely provides additional details regarding the same instance of sexual abuse. *Brown v. State*, 189 S.W.3d 382, 387 (Tex. App.—Texarkana 2006, pet. ref'd) ("[B]efore more than one outcry witness may testify, it must be determined the outcry concerned different events and was not simply a repetition of the same event told to different individuals."); *Tear v. State*, 74 S.W.3d 555, 559 (Tex. App.—Dallas 2002, pet. ref'd); *see also McDaniel v. State*, No. 10-18-00353-CR, 2020 WL 1429675, at *1 (Tex. App.—Waco Mar. 23, 2020, no pet.) (mem. op., not designated for publication).

## C.    Urzua's Designation

We now turn to Banda's claim that Urzua was not the first person T.B. made an outcry to. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a).

For Banda's subsidiary claim—that Urzua, as an investigator with the Department, is not a trusted person as required by the statute—we observe that "statutory construction is a question of law, which we review de novo." *Cary v. State*, 507 S.W.3d 750, 756 (Tex. Crim. App. 2016); *Nguyen v. State,* 359 S.W.3d 636, 641 (Tex. Crim. App. 2012). In

interpreting statutes, we seek to effectuate the Legislature's collective intent and presume that the Legislature intended for the entire statutory scheme to be effective. *See* TEX. GOV'T CODE § 311.021; *Bays v. State*, 396 S.W.3d 580, 584 (Tex. Crim. App. 2013); *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). "[We] focus our attention on the literal text of the statute and attempt to discern the objective meaning of that text at the time of its enactment." *Bays*, 396 S.W.3d at 584 (citing *Nguyen,* 359 S.W.3d at 642). "If the language is unambiguous, our analysis ends." *Id.* at 584–85 (citing *Boykin,* 818 S.W.2d at 785).

The phrase "trusted person" is not found in the outcry statute.[7] *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a). Rather, the only statutorily provided qualifier attached to an outcry witness is that the witness be a "person, 18 years of age or older, other than the defendant." *Id.* This language is unambiguous, and thus, our analysis ends. TEX. CODE CRIM. PROC. ANN. art. 3.01 (providing that courts should interpret terms used in the Texas Code of Criminal Procedure in accordance with "their usual acceptation in common language, except where specially defined"); *Bays*, 396 S.W.3d at 584–85

---

[7] A similar term, however, is used by the Texas Court of Criminal Appeals in *Bays v. State*. 396 S.W.3d 580, 584 (Tex. Crim. App. 2013). The Court in *Bays* examined whether article 38.072 permits a child's outcry statements "to be conveyed through other mediums, such as video or audio recordings." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)–(b)). The Court determined article 38.072 was ambiguous in that limited respect, and therefore, engaged in a de novo review. *See id.* The Court ultimately concluded:

> Because [the Legislature] envisioned that the child's outcry would take the form of a spontaneous verbal communication to a *trusted adult*, it is reasonable to conclude that the Legislature did not intend to permit admission of a child's videotaped statements, which suggest a lesser degree of spontaneity (and, perhaps, reliability). We conclude that the legislative report's sole reference to testimony rather than to other forms of evidence, and the unlikelihood that a person trusted by the child would videotape her outcry together compel a conclusion that the Legislature did not intend for admission of videotapes under the outcry statute.

*Id.* at 588 (emphasis added).

(providing that where statutory language is unambiguous, "the Legislature must be understood to mean what it has expressed, and it is not for the courts to add to or subtract from such a statute").

Urzua is a "person 18 years of age or older, other than the defendant," and she is therefore qualified to be an outcry witness.[8] *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3); *see, e.g.*, *Espinoza v. State*, 571 S.W.3d 427, 433 (Tex. App.—Fort Worth 2019, pet. ref'd) (determining that forensic interviewer was proper outcry witness when child's allegations during interview made it clear that the alleged offense occurred); *Buentello v. State*, 512 S.W.3d 508, 517 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (same); *Caballero-Lopez v. State*, No. 13-14-00370-CR, 2015 WL 5626227, at *4 (Tex. App.—Corpus Christi–Edinburg Sept. 17, 2015, no pet.) (mem. op., not designated for publication) (same). We now move to the crux of Banda's first issue: Was Urzua the first adult to whom T.B. outcried regarding allegations of sexual abuse?

Banda was being tried for separate offenses involving sexual abuse: continuous sexual abuse of a child, aggravated sexual assault of a child, and indecency with a child. *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11(a)(1), 22.021(a)(1)(B)(ii). The record reflects that T.B. described separate offenses to two adults—the penetration of T.B.'s mouth by

---

[8] Whether Urzua is a reliable or credible outcry witness is an entirely separate determination. As this Court has previously concluded, such questions of credibility and reliability are determinations for the fact-finder—not for the trial court during its outcry hearing. *See Sanchez*, 354 S.W.3d at 88 ("[T]he narrow range of discretion that Article 38.072 allows a trial court means that the credibility of the outcry witness is not a relevant issue at a hearing to determine admissibility of an outcry."); *see also Morin v. State*, No. 13-18-00149-CR, 2020 WL 582157, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 6, 2020, no pet.) (mem. op., not designated for publication) ("[T]he trial court makes no determination on an outcry witness's credibility during an outcry hearing. . . . The outcry statute merely requires that the trial court find the statement by the child to be reliable."); *Carielo v. State*, No. 04-15-00741-CR, 2017 WL 2960409, at *3 (Tex. App.—San Antonio July 12, 2017, no pet.) (mem. op., not designated for publication) ("The outcry witness's biases may be such that a fact-finder would not believe the outcry statement as relayed by the witness, but that is not a matter that the legislature has given to the trial court's discretion.") (citations omitted).

Banda's penis and Banda's fondling of her breasts, first described to her mother, and the digital penetration of T.B.'s genitals by Banda's hand, first described to Urzua. Therefore, the trial court did not abuse its discretion in designating two outcry witnesses and allowing each witness to testify to separate and distinct acts of sexual abuse. *See Lopez*, 343 S.W.3d at 140; *see also Caballero-Lopez*, 2015 WL 5626227, at *4 (concluding the trial court did not abuse its discretion in allowing two witnesses to testify about two separate instances of sexual assault). We overrule Banda's first issue.

## D.    T.B.'s Age Preclusion Challenge

By his second issue, Banda asserts that T.B., seventeen years old at the time of trial, is not a child under Texas Penal Code §§ 8.07 or 22.011(c)(1),[9] therefore she cannot utilize the hearsay exception afforded by article 38.072. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a); TEX. PENAL CODE ANN. §§ 8.07 (age affecting criminal responsibility), 22.011 (sexual assault statute defining "child" as a "person younger than 17 years of age"). Banda argues that, in the absence of a definition of child set out in article 38.072, we should look at the definition of child in the particular penal code provisions with which a defendant is charged to determine if the outcry statement was, in fact, made by a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a). Therefore, Banda contends that a child under article 38.072—for purposes of this case—should be someone younger than seventeen because that is how each of the three penal code provisions that he was charged with violating define a child. *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11(a)(1), 22.021(b)(1). Banda further asserts that, since a person that is seventeen years of age

---

[9] Banda was indicted and convicted under Texas Penal Code §§ 21.02, 21.11(a)(1), and 22.021(a)(1)(B)(ii). *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11(a)(1), 22.021(a)(1)(B)(ii). Sections 21.02 and 22.021 afford the term "child" with "the meaning assigned by Section 22.011(c)." *Id.* at §§ 21.02(a), 22.021(b)(1). It is unclear why Banda cites to § 8.07. *See id.* at § 8.07.

or older cannot be the victim of any of these offenses, such person should not be considered a child under article 38.072. We disagree with Banda's analysis.

The maximum age of the victim at the time the offense is committed is a matter explicitly addressed in article 38.072. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 1. Article 38.072 prescribes that the "article applies to a proceeding in the prosecution of an offense under any of the following provisions of the Penal Code, *if committed against a child younger than 14 years of age* or a person with a disability." *Id.* (emphasis added). In other words, embedded in article 38.072 exists a limitation: although a person could still be charged with any of the enumerated offenses contained in article 38.072, wherein the complainant is a child under seventeen years of age, the article can only be utilized where the complainant is younger than fourteen years of age at the time of the offense.

Furthermore, as our sister courts have noted, an additional article 38.072 restriction persists: the statute requires that the victim not only be younger than fourteen years of age at the time of the offense, but he or she must make an outcry before his or her eighteenth birthday for the statute to apply. *See Eldred v. State*, 431 S.W.3d 177, 183 (Tex. App.—Texarkana 2014, pet. ref'd); *Harvey v. State*, 123 S.W.3d 623, 629 (Tex. App.—Texarkana 2003, pet. ref'd); *see also Salas v. State*, No. 04-12-00015-CR, 2013 WL 1148925, at *2 (Tex. App.—San Antonio Mar. 20, 2013, pet. ref'd) (mem. op., not designated for publication); *Alejo v. State*, No. 03-10-00436-CR, 2011 WL 3659309, at *4 (Tex. App.—Austin Aug. 19, 2011, no pet.) (mem. op., not designated for publication); *Robbins v. State*, No. 07-05-0207-CR, 2005 WL 2898067, at *1 (Tex. App.—Amarillo Nov. 3, 2005, no pet.) (mem. op., not designated for publication).

It would therefore belie reason for us to read a third limitation into the statute—that the child, in addition to being under the age of fourteen at the time of the offense and having outcried before the age of eighteen, must also be under the age of seventeen at the time of trial. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072; TEX. GOV'T CODE § 311.021; *Bays*, 396 S.W.3d at 584; *Harvey*, 123 S.W.3d at 629. We do not opine as to whether a child must be under the age of eighteen at the time of trial, as that question is not before this court.[10]

We overrule Banda's second issue.

### III.    LARSON'S TESTIMONY

By his third and fourth issues, Banda argues the trial court abused its discretion in admitting the lay witness testimony of Larson, who was not designated as an expert witness prior to trial, and the trial court improperly restrained his ability to cross-examine Larson. *See* TEX. R. EVID. 611(b), 701, 702.

### A.    Lay Witness Opinion

As with the admissibility of evidence generally, the qualifications of a witness to testify as an expert or as a lay witness are within the discretion of the trial court. *See* TEX. R. EVID. 104(a); *Osbourn v. State*, 92 S.W.3d 531, 537–38 (Tex. Crim. App. 2002). Absent a showing of an abuse of discretion, such decision will not be disturbed on appeal.

---

[10] However, we observe that article 38.072 has been referenced and utilized by the prosecution in cases in which the complainant was eighteen years old or older at the time of trial. *See, e.g.*, *Olivera v. State*, No. 05-08-00527-CR, 2009 WL 3740781, at *7 (Tex. App.—Dallas Nov. 10, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding the complainant's outcry statement was admissible under article 38.072 where the complainant was twenty years old at the time of trial) (mem. op., not designated for publication); *Krupa v. State*, No. 05-02-00116-CR, 2003 WL 115357 (Tex. App.—Dallas Jan. 14, 2003, pet. ref'd) (mem. op., not designated for publication) (concluding the same where the complainant was eighteen years old at the time of trial).

*Rhomer*, 569 S.W.3d at 669; *Buford v. State*, 606 S.W.3d 363, 372 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

Rule 701 and 702 concern lay witness and expert witness opinion testimony, respectively. TEX. R. EVID. 701, 702. Rule 701 requires that a witness (1) rationally base his or her testimony on his or her "objective perception of events—i.e., his own senses or experience" and (2) be helpful to clearly understanding the witness's testimony or to determining a fact in issue. *Hartwell v. State*, 476 S.W.3d 523, 536 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd) (citing *Fairow v. State*, 943 S.W.2d 895, 897 (Tex. Crim. App. 1997)). An opinion is rationally based on a witness's perception if a reasonable person could draw the same opinion under the circumstances. *Id*. So long as the witness's opinions, beliefs, or inferences are drawn from his or her own experiences or observations, the witness may testify concerning those opinions, beliefs, or inferences. *Osbourn*, 92 S.W.3d at 535; *Hartwell*, 476 S.W.3d at 536. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. However, the State is required to disclose the name and address of each person to present evidence under Rule 702 following a party's request that it do so.[11] *See* TEX. CODE CRIM. PROC. ANN. art. 39.14.

"There is no distinct line between lay opinion and expert opinion." *Rhomer*, 569 S.W.3d at 669 (citing *Osbourn*, 92 S.W.3d at 537). "A person with specialized knowledge may testify about his or her own observations under Rule 701 and may also testify about

---

[11] Banda made such a request in this case, and neither party disputes that Larson was not designated as an expert witness prior to trial. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14.

the theories, facts and data used in his or her area of expertise under Rule 702." *Osbourn,* 92 S.W.3d at 536. Put simply, a witness's qualifications as an expert do not exclude him or her from testifying as a lay witness under Rule 701 provided the elements of Rule 701 are independently met. *Id.*; *see also Flood v. State*, No. 13-10-00266-CR, 2011 WL 2732608, at *2 (Tex. App.—Corpus Christi–Edinburg July 14, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding that *Osbourn* stands for the proposition that "experts are not precluded from offering lay testimony regarding events which they have personally observed").

Larson testified that she is a licensed clinical therapist, trained and nationally certified in Trauma-Focused Cognitive Behavioral Therapy. Larson explained that in her professional experience, she has become very familiar with the emotional and psychological development of children. Larson testified that she personally met with and counseled T.B. for a period of one year.

Banda specifically objected to the following lines of questioning:

| | |
|---|---|
| [STATE:] | What was your impression of [T.B.] at the beginning of your session? |
| [LARSON:] | [T.B.] is very bright. She was very insightful. She was— |
| [DEFENSE COUNSEL:] | And I'll object to that type of characterization. I think she can describe what she looked like or— but as far as those conclusions, those are all going to be opinions. |
| [COURT REPORTER:] | Be what? |
| THE COURT: | It's overruled. Overruled. Opinions. |
| [DEFENSE COUNSEL:] | It will all be opinions. |
| THE COURT: | It's overruled. |

25

. . . .

| | |
|---|---|
| [STATE:] | Is there a reason why [T.B.] was approved for [group and individual therapy]? |
| [DEFENSE COUNSEL:] | And, again, that's expert— |
| THE COURT: | If she knows, she can answer. That's overruled. |
| [LARSON:] | [T.B.] elected to do both. It was her choice. |

Larson's objected-to testimony did not, as Banda contends, rely exclusively on her knowledge, skill, experience, training, or education as a clinical therapist who works with child abuse victims. *See* TEX. R. EVID. 702. For example, Larson did not opine about whether T.B. exhibited any physical or behavioral manifestations of a child abuse victim, or whether she believed T.B. had been forthcoming. *See Osbourn*, 92 S.W.3d at 536; *Yount v. State*, 872 S.W.2d 706, 708–10 (Tex. Crim. App. 1993); *see also Flood*, 2011 WL 2732608, at *2 (concluding that where a forensic interviewer did not testify to the child complainant's veracity or whether the child had "exhibited any physical or behavioral manifestations of a child abuse victim," the witness had provided a lay opinion). Rather, Larson's opinions—that T.B. appeared "bright and insightful" and that T.B. had elected to pursue group and individual therapy—were rationally based on her firsthand observations and perceptions and were helpful for the trier of fact. *See* TEX. R. EVID. 701; *see, e.g.*, *Scott v. State*, 222 S.W.3d 820, 828 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding that a clinical psychologist was permitted to testify under Rule 701 based on her personal observations of the complainant); *see also Montoya v. State*, No. 09-17-00056-CR, 2018 WL 1414719, at *8 (Tex. App.—Beaumont Mar. 21, 2018, pet. ref'd) (mem. op., not designated for publication) (same); *Guardado v. State*, No. 08-11-00030-

26

CR, 2012 WL 2832561, at *10 (Tex. App.—El Paso July 11, 2012, no pet.) (mem. op., not designated for publication) (concluding that a forensic interviewer's lay witness testimony was "helpful to the jury and did not require significant expertise to interpret"). On the record before us, we cannot say that the trial court abused its discretion in admitting Larson's lay opinion testimony.

We overrule Banda's third issue.

## B. Cross-Examination Constraints

Banda next argues he was "not given the opportunity to impeach [Larson] on her lack of knowledge of the field [of recovered memories] and her lack of reliability resulting from that lack of knowledge." *See* TEX. R. EVID. 611(b).

On appeal, we review a trial court's decision to limit cross-examination for an abuse of discretion. *See Nguyen v. State*, 506 S.W.3d 69, 85 (Tex. App.—Texarkana 2016, pet. ref'd); *see also Garcia v. State*, No. 13-17-00218-CR, 2019 WL 1388532, at *6 (Tex. App.—Corpus Christi–Edinburg Mar. 28, 2019, pet. ref'd) (mem. op., not designated for publication). Because relevant evidence is generally admissible, *see* TEX. R. EVID. 402, and any possible bias or attack on the credibility of a witness is always relevant, *see Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009), the scope of cross-examination in Texas is broad. *See Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996); *see also* TEX. R. EVID. 611(b) (providing that "[a] witness may be cross-examined on any relevant matter, including credibility"); TEX. CODE CRIM. PROC. ANN. art. 38.04 (providing that jury is exclusive judge of facts proved and of weight to be given to testimony). Thus, a defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify.

*Carroll*, 916 S.W.2d at 497; *see also Mayorga v. State*, No. 13-18-00003-CR, 2019 WL 1474682, at *4 (Tex. App.—Corpus Christi–Edinburg Apr. 4, 2019, no pet.) (mem. op., not designated for publication).

The scope of appropriate cross-examination is, however, not unlimited, and the trial court generally has "wide discretion in limiting the scope and extent of cross-examination." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009); *Carroll*, 916 S.W.2d at 497–98. For example, a trial court may properly limit the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation. *Carroll*, 916 S.W.2d at 498; *Chambers v. State*, 866 S.W.2d 9, 26–27 (Tex. Crim. App. 1993).

Here—after Larson had acquiesced that she was "aware" of but unfamiliar with research regarding memory retrieval—defense counsel specifically sought to question Larson regarding a study "dealing with false convictions as a result of what we view nationally as Satanic cults taking over day care centers." Larson responded that she had "read about those," and the State interjected with an objection, arguing that defense counsel's questioning had gone "outside the scope" of cross-examination. The trial court sustained the State's objection, and defense counsel requested a bill of review outside of the jury's presence. The following transpired during the bill of review:

[DEFENSE COUNSEL]:    Okay. Well, do you recall that there were 48 children after therapy who made accusations and that made claims that there had been Satanic rituals in tunnels, multiple convictions, and then it was found out that there were no tunnels present and the accusations were impossible? Do you remember that?

[LARSON:]    Vaguely, yes.

28

| | |
|---|---|
| [DEFENSE COUNSEL]: | Do you remember the incident—the issues that would arise that some of the children, as they began to develop their stories, started talking about witches flying around, and also the presence of Chuck Norris, who was not, in fact, present? |
| [LARSON:] | Somehow I do not remember that detail. |
| [DEFENSE COUNSEL]: | Okay. Are you familiar with the 1985 Wee Care Nurs—Nursery School from Maplewood, New Jersey? |
| [LARSON:] | I don't think—that doesn't ring a bell. |
| [DEFENSE COUNSEL]: | All right. Are you familiar with the problems that come with memory in having suggestions on the "Lost in the Mall" experiments? Are you familiar with those? |
| [LARSON:] | Not really, sir. |
| [DEFENSE COUNSEL]: | That's all I have, Judge. |

Banda argues the trial court improperly curtailed his cross-examination of Larson when her lack of knowledge regarding these studies was indicative of her incompetence with respect to memory and retrieval error research. Larson, however, conceded her unfamiliarity with such research before the jury. That the jury did not hear of the three individual studies Larson was specifically unfamiliar with did not impede Banda's ability to scrutinize Larson's credibility. *See Hammer*, 296 S.W.3d at 561; *Carroll*, 916 S.W.2d at 497–98; *see also Treybig v. State*, No. 13-05-00333-CR, 2007 WL 2428632, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 29, 2007, pet. ref'd) (mem. op., not designated for publication) (holding that where the evidence the appellant sought to submit via the excluded cross-examination "was already before the jury," the trial court did not abuse its

discretion in excluding the explicit testimony appellant sought). Thus, we conclude that the trial court did not abuse its discretion in excluding the explicit testimony Banda sought.

We overrule Banda's fourth issue.

### IV. DETECTIVE DELGADO'S TESTIMONY

By issues five and six, Banda contends that the trial court erred by permitting testimony from Detective Delgado which "arose out of lack of personal knowledge, improper opinions, and hearsay," *see* TEX. R. EVID. 602, 701, 802, and by making inappropriate comments in the presence of the jury in violation of article 38.05 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *Patterson v. State*, 606 S.W.3d 3, 33 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd). A trial court abuses its discretion when its decision lies outside the "zone of reasonable disagreement." *Wells*, 611 S.W.3d at 427; *Patterson*, 606 S.W.3d at 33.

Pursuant to Rule 602, a witness may testify to a matter only if sufficient evidence supports a finding that the witness has personal knowledge of the matter. TEX. R. EVID. 602; *Osbourn*, 92 S.W.3d at 535; *Amberson v. State*, 552 S.W.3d 321, 330 (Tex. App.—Corpus Christi–Edinburg 2018, pet. ref'd). Rule 701, as discussed *supra*, concerns lay witness opinion testimony. *See* TEX. R. EVID. 701. So long as the witness's opinions, beliefs, or inferences are drawn from his or her own experiences or observations, the witness may testify concerning those opinions, beliefs, or inferences. *Osbourn*, 92 S.W.3d at 535; *Hartwell*, 476 S.W.3d at 536. "Crucially, rule 701's requirement that the testimony

be based on the witness's perception presumes that the witness meets the personal-knowledge requirement of rule 602." *Madrigal v. State*, 347 S.W.3d 809, 814 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd); *Fairow*, 943 S.W.2d at 898. When a party objects on the grounds that testimony is speculative, Texas Rules of Evidence 602 and 701 apply. *See* TEX. R. EVID. 602, 701; *Solomon v. State*, 49 S.W.3d 356, 364–65 (Tex. Crim. App. 2001); *see also Jones v. State*, No. 13-19-00531-CR, 2020 WL 5050640, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 20, 2020, no pet.) (mem. op., not designated for publication).

Generally, the erroneous admission of evidence constitutes non-constitutional error, subject to a harm analysis, and requiring reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Amberson*, 552 S.W.3d at 334. We review the entire record—"including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case"—to ascertain the effect or influence of the wrongfully admitted evidence on the verdict. *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011); *Amberson*, 552 S.W.3d at 334. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis under Rule 44.2(b). *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008).

## B.    Discussion

In his brief, Banda references sixteen separate testimony excerpts, which he argues exemplifies the "efforts by the witness and prosecutor to introduce improper testimony." Several of the excerpts, however, depict objections to the testimony which

were sustained, leaving no adverse ruling for review. *See Schmidt v. State*, 612 S.W.3d 359, 372 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *see also Hernandez v. State*, No. 13-10-00505-CR, 2012 WL 1964589, at *5 (Tex. App.—Corpus Christi–Edinburg May 31, 2012, pet. ref'd) (mem. op., not designated for publication). ("[Appellant] may not complain because he received all the relief he requested, and [there] was no adverse ruling."). For purposes of brevity, we include below only those which were overruled and only those which were adequately briefed in addition to being summarily referenced.[12] *See* TEX. R. APP. P. 38.1(i), 47.4.

### 1. Colloquy No. 1

In the first colloquy we review, Banda objects to Detective Delgado's testimony regarding the investigation process:

| [STATE:] | Why is it important for you to find out why it was or what the circumstances were that a child first tells about abuse? |
|---|---|
| [DELGADO:] | It would show whether—whether the child was maybe told to say these types of things, or the reason. |

---

[12] For example, Banda references the following exchange, wherein he objects to hearsay but cites to Rule 402:

| [STATE:] | And what was the reason that [you and Urzua] spoke to each other? |
|---|---|
| [DELGADO:] | She was the investigator on the side of [the Department]. And, if I remember correctly, she had also spoken to them, to both [A.C.] and [T.B.]. |
| [DEFENSE COUNSEL:] | That would be hearsay, Judge. We object to it under Rule 402. |
| THE COURT: | He hasn't discussed anything of what he said—or what she said, rather. Overruled. |

However, apart from noting that he preserved hearsay objections in the trial court, Banda provides no further analysis in support of his hearsay contention on appeal. Therefore, any such contention is waived because it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

> [DEFENSE COUNSEL:]   Pardon me. I'm going to object that this is eliciting an opinion as to the veracity of witnesses in the case, which is improper.
>
> THE COURT:   That will be [o]verruled.

We first observe that the State did not ask about the complainants in this case, but instead, the State inquired on the reasoning behind how Detective Delgado conducts his investigations, which was helpful for the trier of fact to understand the investigatory process. *See Osbourn*, 92 S.W.3d at 535; *Madrigal*, 347 S.W.3d at 814; *see also Guardado*, 2012 WL 2832561, at *10. Detective Delgado's testimony established that he possessed extensive practical experience as an investigator prior to Banda's objection. Thus, Detective Delgado, drawing from his observations and experiences, may testify to such opinion or inference under Rules 602 and 701. *See Osbourn*, 92 S.W.3d at 535; *Madrigal*, 347 S.W.3d at 814; *see also Guerra v. State*, No. 13-18-00635-CR, 2019 WL 3227536, at *2 (Tex. App.—Corpus Christi–Edinburg July 18, 2019, no pet.) (mem. op., not designated for publication) (providing that an officer may draw "inferences directly from personal observations and experiences" when testifying under Rule 701); *see, e.g., Guerrero v. State*, No. 02-11-00421-CR, 2012 WL 5258700, at *3 (Tex. App.—Fort Worth Oct. 25, 2012, no pet.) (mem. op., not designated for publication) (concluding that a detective "was capable of expressing an opinion of how child abusers target children" under Rule 701, where his testimony was based on his extensive practical experience and not on a scientific theory). We conclude the trial court did not abuse its discretion in overruling Banda's objection. *Wells*, 611 S.W.3d at 427; *Patterson*, 606 S.W.3d at 33.

## 2. Colloquy No. 2

The next line of questioning concerns Detective Delgado's case-specific investigation observations and inferences:

| [STATE:] | And during the—your investigation, do you know if the girls ever went for a medical exam at the hospital? |
| --- | --- |
| [DELGADO:] | Yes. They were referred to a—a SANE exam. |
| [DEFENSE COUNSEL:] | And, Judge, it's a 602. He has no personal knowledge. We've had other witnesses of this. But for him to come in and—and describe secondhand information, it's 602 and it's 802 hearsay, and 402 relevance, and 701 opinion violation.[13] |
| THE COURT: | As to whether the child sought an exam? |
| [DEFENSE COUNSEL:] | Yeah. Well, sure. |
| THE COURT: . . . . | That's opinion, Counsel? Overruled at this point. |
| [STATE:] | And what was the reason—reason, or reasons that you decided to get an arrest warrant? |
| [DEFENSE COUNSEL:] | That, [what] we would object to, is set on one opinion. His opinion on—is not relevant to this jury. He's not to be the ultimate finder of fact. In order to reach that opinion, he has to opine on veracity. |
| THE COURT: | Overruled. |
| [STATE:] | What were the reasons that you decided to obtain an arrest warrant? |
| [DELGADO:] | On this case, the arrest warrant was obtained based on the statements that were given by both victims. |

---

[13] Once more, we do not address objections at the trial court that do not comport with Banda's briefed complaints on appeal. *See* Tex. R. App. P. 38.1(i).

34

[DEFENSE COUNSEL:]      All right. And I'll further object to that. That's an 802 violation, a confrontation clause violation, and it's an opinion violation, and he opines as to the veracity of them.

THE COURT:               Overruled.

Banda misunderstands the "personal knowledge" requirement of Rule 602 and 701. *See* TEX. R. EVID. 602, 701. Pursuant to Rule 602 and 701, it is not imperative that Detective Delgado be physically present at the complainant's medical examination to be able to proffer a general affirmation that such examination occurred. *See Osbourn*, 92 S.W.3d at 535. Detective Delgado learned of the occurrence based on information gathered through the course of his investigation, and thus, such limited testimony was permissible. *See id.*; *see also Villarreal v. State*, No. 11-17-00136-CR, 2019 WL 2307759, at *5 (Tex. App.—Eastland May 31, 2019, no pet.) (mem. op., not designated for publication) (concluding a detective could, within the confines of Rule 701, testify to reasonably deduced details based on his investigation); *Matamoros v. State*, No. 13-13-00692-CR, 2015 WL 6759331, at *9 (Tex. App.—Corpus Christi–Edinburg Nov. 5, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding testimony was "rationally based on [the witness's] perception" and admissible under Rule 701 where the witness testified "based on facts gathered during her investigation").

Moreover, Detective Delgado's testimony was a broad explanation of events leading to the issuance of Banda's arrest warrant—not a direct opinion on the veracity of the complainants in this case—and was helpful for the trier of fact. *See Osbourn*, 92 S.W.3d at 535; *Madrigal*, 347 S.W.3d at 814; *see, e.g.*, *Choice v. State*, No. 05-19-00178-CR, 2020 WL 5668737, at *3 (Tex. App.—Dallas Sept. 24, 2020, no pet.) (mem. op., not designated for publication) ("[T]estimony concerning the progression of required

35

standards of proof in a criminal case, and how they applied in this investigation, was helpful to explain why he arrested appellant and why he continued to investigate the circumstances of Arzola's death after the arrest."); *Reed v. State*, No. 01-15-00481-CR, 2017 WL 1352131, at *4 (Tex. App.—Houston [1st Dist.] Apr. 13, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding that the trial court did not abuse its discretion under Rule 701 when it admitted the officer's explanatory opinion "offered to explain the course of his investigation and how he came to believe that Reed was running the theft operation"). Accordingly, the trial court did not abuse its discretion by denying Banda's request for exclusion of this testimony. *See Wells*, 611 S.W.3d at 427; *Patterson*, 606 S.W.3d at 33.

### 3. Colloquy No. 3

The following colloquy involves Detective Delgado's observations concerning T.B.'s recorded forensic interview:

| [STATE:] | In watching [T.B.'s forensic] video, can you describe to the jury her demeanor as she's being interviewed? |
|---|---|
| [DEFENSE COUNSEL:] | I'll object to that. What we have is a 602— |
| THE COURT: | What's the objection? |
| [DEFENSE COUNSEL:] | 602 personal knowledge. I mean, he— |
| THE COURT: | I heard the objection, [defense counsel]. He—he can testify as to the demeanor, but not as to the content, so overruled. |
| [DEFENSE COUNSEL:] | Let me make another objection. A 701 opinion. He's rendering an opinion, h[er] demeanor from a video that he was—of an interview that he wasn't present at. |

| | |
|---|---|
| THE COURT: | That's subject to cross-examination, [defense counsel]. It's overruled. |
| [DEFENSE COUNSEL:] | All right. |
| THE COURT: | That will go to the weight of the evidence. |
| [DEFENSE COUNSEL:] | Let me be clear on my objection. Under 701, if the opinion does not benefit the fact finder, then it does not meet the standard of 701. That's my objection. |
| THE COURT: | I understood it the first time and it's overruled. Please proceed. |
| [STATE:] | What was [T.B.'s] demeanor during her interview? |
| [DELGADO:] | When she was interviewed, she seemed a little held to herself, like in a way, shielding herself. |
| [DEFENSE COUNSEL:] | And I'll object to that. It's speculative. He doesn't know the child's emotion. And—and to ask him what the emotions were is just beyond the scope of his ability. |
| THE COURT: | The question wasn't the emotion; it was demeanor, [defense counsel]. |
| [DEFENSE COUNSEL:] | But his answer, Your Honor. |
| THE COURT: | Okay. The objection is overruled. |
| . . . . | |
| [STATE:] | Did her demeanor ever change at the interview? |
| [DELGADO:] | Throughout the interview, I would say no. |
| [STATE:] | How would you describe her demeanor? |
| [DELGADO:] | Her demeanor was stiff. Her answers were direct as they were being asked. |
| [DEFENSE COUNSEL:] | That's an opinion as to content. We'll object to it. |

37

THE COURT:                    Overruled.

Assuming without deciding that the trial court abused its discretion in permitting Detective Delgado to testify to his observation of T.B.'s demeanor during her recorded forensic interview, which is otherwise generally inadmissible, the error was harmless. *See Osbourn*, 92 S.W.3d at 535; *see also Gonzalez v. State*, No. 05-10-00017-CR, 2011 WL 47169, at *4 (Tex. App.—Dallas Jan. 7, 2011, no pet.) (mem. op., not designated for publication) (holding that the trial court did not abuse its discretion in admitting an officer's lay testimony based off of observations from watching the complainant's forensic interview).

There was ample evidence that Banda committed the charged offenses absent Detective Delgado's comments. *See Coble*, 330 S.W.3d at 286 (holding in a case where expert testimony was improperly admitted that the existence of "ample other evidence" supporting the finding weighed against harm); *Neal*, 256 S.W.3d at 285. Although the jury was never privy to the forensic interview recording and could not make an independent determination on T.B.'s demeanor during the interview, the jury had an opportunity to hear several other witnesses opine to T.B.'s demeanor during her various disclosures. Moreover, the jury assessed T.B.'s demeanor first-hand at trial, wherein T.B. described multiple acts of digital penetration, fondling, and oral sex. *See Barshaw*, 342 S.W.3d at 94; *Amberson*, 552 S.W.3d at 334. Additionally, Detective Delgado's opinions of T.B.'s demeanor were not otherwise mentioned or emphasized by the State in closing arguments. *See Coble*, 330 S.W.3d at 287 (holding that improperly-admitted expert testimony was harmless in part because the State "barely mentioned" the expert during closing argument and did not emphasize his opinions); *see also Brambila v. State*, No.

13-15-00082-CR, 2016 WL 7242847, at *11 (Tex. App.—Corpus Christi–Edinburg Dec. 15, 2016, pet. ref'd) (mem. op., not designated for publication). After considering the entire record, we have a fair assurance that any error in allowing Detective Delgado to answer the prosecutor's questions regarding T.B.'s demeanor was harmless.

We overrule Banda's fifth issue.

### 4.     Summary Witness Testimony

Banda alternatively asserts that Detective Delgado's testimony is "improper summary witness testimony," prohibited under the Texas Rules of Evidence. Banda cites no specific Texas rule, noting only that the case law demonstrating "summary witness testimony" is mostly from the Fifth Circuit, "but it is based on interpretation of Rules of Evidence that are unchanged in the Texas Rules of Evidence." *See* FED. R. EVID. 1006; *United States v. Nicholson*, 961 F.3d 328, 335 (5th Cir. 2020) (explaining "summary witness" Federal Rule of Evidence 1006 and noting the confines of which the rule is utilized).

In any matter, having reviewed the record, Banda makes no objection on the aforementioned basis before the trial court, and we conclude this argument has not been preserved for our review. *See* TEX. R. APP. P. 33.1(a) (providing that to preserve a complaint for appellate review, a party must make a timely, specific objection in the trial court); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) ("[I]f, on appeal, a defendant claims the trial judge erred in admitting evidence offered by the State, this error must have been preserved by a proper objection and a ruling on that objection.").

## C. The Trial Court's Comments

By his sixth issue, intertwined in his Rule 601 and 702 arguments, Banda contends that the trial court erred by making inappropriate comments in the presence of the jury in violation of article 38.05 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05 (providing that a judge shall not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case").

Article 38.05 of the Texas Code of Criminal Procedure requires a neutral and detached judge. *Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014) (citing *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006)); *see* U.S. CONST. amend. XIV; TEX. CODE CRIM. PROC. ANN. art. 38.05. A trial court may exercise "reasonable control" over the presentation of evidence so as to "(1) make those procedures effective for determining truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." TEX. R. EVID. 611(a)(1)–(3). When doing so, however, "[t]he trial judge shall maintain an attitude of impartiality." *Ex parte Scott*, 541 S.W.3d 104, 125 (Tex. Crim. App. 2017) (quoting *Lagrone v. State*, 209 S.W. 411, 415 (Tex. Crim. App. 1919)). "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see Brown v. State*, 122 S.W.3d 794, 798 & n.8 (Tex. Crim. App. 2003) (noting that a trial judge must refrain from making any remark calculated to convey his opinion of the case

because jurors give special and particular weight to the language and conduct of the trial judge).

When a trial judge does improperly comment, it constitutes reversible error only if the comment was "reasonably calculated to prejudice the defendant's rights." *Ex parte Scott*, 541 S.W.3d at 125; *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (providing that a violation of article 38.05 is subject to a non-constitutional harm analysis). An article 38.05 challenge may be urged for the first time on appeal. *Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017).

Banda argues the trial court showed bias against the defense and "gratuitously bolster[ed] the witness's testimony" when the following occurred:

| [STATE:] | So you didn't just take those messages that mom sent you, you actually had that child interviewed separately? |
|---|---|
| [DELGADO:] | That's correct. |
| [STATE:] | And that helped your investigation? |
| [DELGADO:] | Yes, because it did corroborate that that conversation did exist. |
| [DEFENSE COUNSEL:] | Your—I'm sorry. Are you done? |
| [STATE:] | I will pass the witness. |
| THE COURT: | *It's a little late in the day to get excited, [Defense Counsel].* |

RECROSS-EXAMINATION

| [DEFENSE COUNSEL:] | All right. But the fact is, is there was a kid named Deandre. We believe that to be true, right? |
|---|---|
| . . . . | |
| THE COURT: | Now, may this witness be excused? |

41

| | |
|---|---|
| [STATE:] | Yes, Your Honor. |
| [DEFENSE COUNSEL:] | No objection. |
| THE COURT: | All right. Thank you, Detective. I called you "officer" earlier, and I apologize. Detective. I appreciate it. |
| [DEFENSE COUNSEL:] | And then I followed it, and I apologize, also. |
| THE COURT: | *We work hard to get those promotions.* Okay. So we're going to break here. . . . |

(Emphasis added).

Banda avers that the trial court's comment that "It's a little late in the day to get excited" after defense counsel interjected during the State's re-direct examination of a witness was improper commentary, as was the trial court's statement, "We work hard to get those promotions," made after the conclusion of Detective Delgado's testimony. We disagree with Banda's assessment of either of these comments.

These isolated statements, which appear to have been made in jest, do not violate article 38.05 because neither were reasonably calculated to benefit the State or prejudice the defendant's rights, and they are distinguishable from cases where the trial court's statements were determined to be improper. *Cf. Proenza v. State*, 555 S.W.3d 389, 397 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (concluding a trial court improperly commented on the weight of the evidence when it repeatedly interrupted a witness testimony to indicate its disbelief in appellant's position that he thought he could not seek medical care for a minor without proper documentation and thus determining that the trial court had "diminished the credibility of [appellant's] approach to the case"); *see also Navarro v. State*, No. 13-17-00197-CR, 2018 WL 3386350, at *5–6 (Tex. App.—Corpus

42

Christi–Edinburg July 12, 2018, no pet.) (mem. op., not designated for publication) (concluding the trial court did not improperly comment on the weight of witness testimony when the court stated that the witness was "the chief of police" and the court did not "know any greater qualification than that"). Therefore, we conclude the statements by the trial court here did not amount to a violation of article 38.05. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05; *Proenza*, 541 S.W.3d at 791. Accordingly, we overrule Banda's sixth issue.

## V.     BAD ACTS

Banda argues by his seventh issue that the trial court abused its discretion in "allowing attacks against [him] outside of notice given in [Rule] 404" when a State's witness testified to whether Banda watched pornography. *See* TEX. R. EVID. 404.

### A.     Standard of Review and Applicable Law

We review a decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Rodriguez v. State*, 546 S.W.3d 843, 863 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Rule 404 regulates admissibility of relevant evidence of other crimes, wrongs, or acts provided it has relevance apart from the tendency to prove conduct in conformity with character, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404; *see Gonzalez*, 544 S.W.3d at 370–71. The introduction of extraneous offense evidence in violation of Rule 404(b) is "inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not part of the present case against him." *Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008) (quoting *Pollard v. State*, 255 S.W.3d 184, 187–88 (Tex. App.—San Antonio 2008), *aff'd,* 277 S.W.3d 25 (Tex. Crim. App. 2009)).

43

"By its very nature, an improperly admitted extraneous offense tends to be harmful. It encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged." *Graves v. State*, 452 S.W.3d 907, 915 (Tex. App.—Texarkana 2014, pet. ref'd).

We review the erroneous admission of extraneous offense or extraneous bad act evidence for non-constitutional error under Texas Rule of Appellate Procedure 44.2(b). TEX. R. APP. P. 44.2(b); *Rodriguez*, 546 S.W.3d at 863; *Lopez v. State*, 288 S.W.3d 148, 173 (Tex. App.—Corpus Christi–Edinburg 2009, pet. ref'd).

## B.     Discussion

T.B. testified that Banda showed her pornography; Urzua testified that T.B. stated that Banda showed her pornography. Banda did not object to either testimony. Banda only objected to J.M.'s testimony regarding his pornography consumption:

| | |
|---|---|
| [STATE:] | Do you know if the defendant ever watched pornography? |
| [J.M.:] | Yes. |
| [STATE:] | And how do you know that? |
| [DEFENSE COUNSEL:] | This would be individual, non-pled wrongful acts, and we'd object to it as a 404 violation. |
| [STATE:] | Your Honor, watching pornography on its own is not a bad act. |
| THE COURT: | Overruled, [Defense Counsel]. |

Assuming without deciding the trial court erred in admitting this testimony, we conclude the error was harmless. *See Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978) ("It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not

challenged."); *Gutierrez v. State*, 585 S.W.3d 599, 617–18 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (finding error was harmless where "the State did not emphasize the bestiality pornography, the testimony about it was brief, it was not published to the jury, the nature of the other evidence of guilt was significant, and the jury instructions limited the jury's consideration of the evidence to the permissible Rule 404(b)(2) uses"); *Belt v. State*, 227 S.W.3d 339, 343 (Tex. App.—Texarkana 2007, no pet.) (holding no reversible error where appellant made no objection to prior testimony regarding appellant's possession of pornographic materials and only objected during the State cross-examination of appellant regarding his possession of pornography); *see also Luke v. State*, No. 14-18-00737-CR, 2019 WL 6876247, at *3 (Tex. App.—Houston [14th Dist.] Dec. 17, 2019, pet. ref'd) (mem. op., not designated for publication) (finding harmless error where counsel did not object initially to testimony from complainant that the appellant forced her to watch pornography but only objected under a separate witness); *Trigo v. State*, No. 05-13-01668-CR, 2014 WL 7496595, at *2–3 (Tex. App.—Dallas Dec. 30, 2014, no pet.) (mem. op., not designated for publication) (finding harmless error where witness testified appellant "watched pornography on the computer a lot," concluding this was "not of a kind [of bad act] that would make a jury likely to conclude that appellant had a propensity to sexually abuse children").

By the time of J.M.'s testimony, which affirmed without elaboration that Banda watched adult pornography, the jury had already heard T.B.'s testimony that appellant forced her to watch adult pornography with him. This former testimony drew no objection, rendering any error in admitting J.M.'s testimony that appellant watched adult

pornography harmless. *See Crocker*, 573 S.W.2d at 201; *see also Luke*, 2019 WL 6876247, at *3. We overrule Banda's seventh issue.

## VI.  DENIAL OF MISTRIAL

Banda moved for a mistrial several times throughout the proceedings. On appeal, Banda does not explicitly argue that the trial court erred in denying his requests for mistrial; instead, Banda argues that trial court nevertheless "committed reversible error" where the court sustained his objection but denied his request for mistrial after the State's witness called him a "pervert." We construe this as a challenge to the trial court's denial of his request for a mistrial. *See* TEX. R. APP. P. 38.9; *see also Metoyer v. State*, No. 13-18-00573-CR, 2019 WL 3331634, at *3 (Tex. App.—Corpus Christi–Edinburg July 25, 2019, pet. ref'd) (mem. op., not designated for publication) ("Even though Metoyer only devoted a single paragraph to the issue and provided no case citations, we will liberally construe his brief and address the issue.").

## A.  Standard of Review and Applicable Law

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion, and we uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011); *Stahmann v. State*, 548 S.W.3d 46, 68 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020). "'[We] view[] the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling.'" *Gonzalez v. State*, 608 S.W.3d 98, 107 (Tex. App.—San Antonio 2020, pet. ref'd) (quoting *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009)).

A mistrial is appropriate in extreme cases of highly prejudicial error when spending any further time or effort on trial "would be wasteful and futile." *Gonzalez*, 608 S.W.3d at 108 (quoting *Ocon*, 284 S.W.3d at 884). When reviewing a trial court's denial of a motion for mistrial, the court of criminal appeals employs a three-factor approach, which balances (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of the punishment (i.e., the likelihood of the conviction absent the misconduct). *Gonzalez*, 616 S.W.3d at 594 (citing *Lee v. State*, 549 S.W.3d 138, 145 n.8 (Tex. Crim. App. 2018)); *see also Cook v. State*, No. 13-19-00610-CR, 2021 WL 317645, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 28, 2021, no pet. h.) (mem. op., not designated for publication) (applying the three-factor test). "If there is no indication of bad faith, and the objectionable testimony does not appear calculated to incurably inflame the jury, then an instruction to disregard will likely suffice." *Gonzalez*, 608 S.W.3d at 107.

## B. Discussion

The following colloquially transpired between the State and Marez, T.B.'s aunt:

| | |
|---|---|
| [STATE:] | And when—once you found out, looking back on your interactions with [T.B.] and [Banda], or when he picked them up, is there anything that now, you're like, "Okay. That makes sense now that I know this"? |
| [MAREZ:] | Yes. |
| [STATE:] | And what is that? |
| [MAREZ:] | That he's a pervert. |
| [STATE:] | Well, in reference to [T.B.], did she ever— |
| [DEFENSE COUNSEL:] | Judge, I'll object to that. What she has elicited is a characterization and an insult, and there's no basis for it in the law whatsoever. |

| THE COURT: | You need to establish a—some grounds for— before you get there, [State]. So the jury will be instructed to disregard that comment. |
|---|---|
| [DEFENSE COUNSEL]: | Then I move for mistrial. |
| THE COURT: | And that will be denied. |

We are not convinced that the State's questioning or Marez's fleeting testimony was so inflammatory as to undermine the efficacy of an instruction to disregard. *See Ocon*, 284 S.W.3d at 884. This is especially so without some proof from the record that the jury did not or could not follow such an instruction given our presumption of instructed compliance. *See id.*; *Thift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see also Hardin v. State*, No. 05-92-02470-CR, 1994 WL 109661, at *4 (Tex. App.—Dallas Mar. 30, 1994, no pet.) (mem. op., not designated for publication) (concluding the trial court's instruction to disregard the State's reference to the appellant as a "pervert" sufficiently cured any error and the trial court did not abuse its discretion in denying appellant's motion for mistrial). Once more, in light of T.B.'s testimony and the corroborating testimony of Nurse Fugate, Urzua, and J.M., the certainty of conviction was high absent Marez's isolated and brief disparaging remark.

Therefore, we cannot say that an application of the three factors to this case establishes that the trial court abused its discretion in denying Banda's motion for mistrial. *See Gonzalez*, 608 S.W.3d at 107; *see also Cook*, 2021 WL 317645, at *3. We overrule Banda's eighth issue.

## VII.  CUMULATIVE ERROR

By his ninth issue, Banda avers that the previous alleged errors cumulatively caused him harm, requiring a reversal. Banda argues the trial court's following errors

48

should also be considered in our cumulative error analysis: (1) the admission of Nurse Fugate's testimony, which Banda objected was improper under Rule 402, 403, 602, 701, and 702 at trial; and (2) the admission of Galvan-Castillo's testimony, which Banda argued was irrelevant at trial. *See* Tex. R. Evid. 402, 403, 602, 701, and 702. Banda, however, does not engage in an independent analysis regarding either of the two purported errors; we, therefore, do not consider them in our cumulative error analysis. *See* Tex. R. App. P. 38.1(i); *Linney v. State*, 413 S.W.3d 766, 768 (Tex. Crim. App. 2013) (Cochran, J., concurring) ("Cumulative error is an independent legal claim that requires the law of cumulative error to be separately applied to the specific facts."); *Fletcher v. Edwards*, 26 S.W.3d 66, 81 n. 1 (Tex. App.—Waco 2000, pet. denied) ("Each issue or related group of issues presented in a brief should be separately briefed.").

The doctrine of cumulative error provides that the cumulative effect of multiple errors can, in the aggregate, constitute reversible error, even though no single instance of error would. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *see Jenkins v. State*, 493 S.W.3d 583, 613 (Tex. Crim. App. 2016). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. Smith*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010); *Rodriguez v. State*, 553 S.W.3d 733, 752 (Tex. App.—Amarillo 2018, no pet.).

Moreover, the Texas Court of Criminal Appeals has held that there is "no authority holding that non-errors may in their cumulative effect cause error." *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009); *see Jenkins*, 493 S.W.3d at 613; *Temple v. State*, 342 S.W.3d 572, 612 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d

341 (Tex. Crim. App. 2013) (providing that reviewing courts do not consider the effect of waived errors under the cumulative error doctrine); *see also Escobedo v. State*, No. 13-19-00205-CR, 2020 WL 6052549, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 8, 2020, no pet.) (mem. op., not designated for publication) (concluding non-errors may not produce harm in their cumulative effect).

Having considered the two errors we deemed harmless,[14] we nevertheless conclude Banda has failed to show that such alleged cumulative error prejudiced his defense to the point that there is a probability the result would have been different but for the two errors or that the errors so "fatally infect[ed] the trial" that they violate[d] the trial's "fundamental fairness." *See Estrada*, 313 S.W.3d at 311; *see, e.g.*, *Bleimeyer v. State*, 616 S.W.3d 234 (Tex. App.—Houston [14th Dist.] 2021, no pet. h.) (concluding that where the alleged errors were either unpreserved or harmless, appellant's cumulative error claim nonetheless failed); *Lumsden v. State*, 564 S.W.3d 858, 899 (Tex. App.—Fort Worth 2018, pet. ref'd) ("Even considering the evidentiary errors we deemed harmless—admitting the video of the forensic interview, admitting the testimony about Lumsden's tampering with government records, and sustaining the State's 'nonresponsive' objections to Lumsden's testimony—we do not believe that the cumulative effect of the admission of this evidence requires reversal."); *see also Seery v. State*, No. 12-11-00095-CR, 2013 WL 683327, at *16 (Tex. App.—Tyler Feb. 21, 2013, pet. ref'd) (mem. op., not designated for publication) (finding no cumulative error where the court "identified two instances of error—admission of Appellant's military record and [the complainant's]

---

[14] This Court concluded *supra* that assuming without deciding the trial court abused its discretion (1) in permitting Detective Delgado to testify to his observation of T.B.'s demeanor during her recorded forensic interview and (2) admitting J.M.'s testimony regarding Banda's pornography consumption, the errors were harmless.

hearsay statements to her mother"). Further, Banda has not shown that the evidentiary errors "synergistically achieve the critical mass necessary to cast a shadow upon the integrity of the verdict." *See Linney*, 413 S.W.3d at 767 (explaining the doctrine of cumulative error).

We overrule Banda's ninth issue.

### VIII.   JUDGMENT MODIFICATION

Although not raised by the parties, we observe a clerical error in the judgment, which states Banda was found guilty and convicted in part under Texas Penal Code § 22.021(a)(2)(B). The record clearly establishes that Banda was convicted under § 22.021(a)(1)(B)(ii), (2)(B), namely by intentionally or knowingly "caus[ing] the penetration of the mouth of a child [younger than fourteen years of age] by the sexual organ of the actor." *See* TEX. PENAL CODE § 22.021(a)(1)(B)(ii), (2)(B).

We may modify incorrect judgments to make the record "speak the truth" when we have the necessary data and information, and we may do so on our own motion. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). We have the power to modify whatever the trial court could have corrected by a judgment nunc pro tunc when the information necessary to correct the judgment appears in the record. *Ette v. State*, 551 S.W.3d 783, 792 (Tex. App.—Fort Worth 2017), *aff'd*, 559 S.W.3d 511 (Tex. Crim. App. 2018). We conclude that the necessary information to correct the judgment appears in the record. *See id.* Therefore, we modify the trial court's judgment to reflect that Banda was convicted in part under § 22.021(a)(1)(B)(ii), (2)(B).

## IX.    CONCLUSION

We affirm the trial court's judgment as modified.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
20th day of May, 2021.